# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 9, 2018          Decided May 24, 2019

No. 17-1266

JEFF BLAU, TAX MATTERS PARTNER OF RERI HOLDINGS I, LLC,
APPELLANT

v.

COMMISSIONER OF INTERNAL REVENUE SERVICE,
APPELLEE

———

On Appeal from the Decision
of the United States Tax Court

———

*Kathleen Pakenham* argued the cause for appellant. With her on the briefs were *Stephen D. Gardner*, *Adriana Lofaro Wirtz*, and *Clint Massengill*.

*Jacob Earl Christensen*, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief was *Richard Farber*, Attorney.

Before: ROGERS and MILLETT, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* GINSBURG.

2

GINSBURG, *Senior Circuit Judge*: RERI Holdings, LLC (RERI) claimed a charitable contribution deduction of $33 million on its 2003 federal tax return. The Internal Revenue Service determined that RERI was not entitled to this deduction and imposed a 40% penalty for underpayment of tax. RERI unsuccessfully challenged both rulings before the Tax Court, and now appeals to this court on a variety of grounds. For the reasons set forth below, we affirm the judgment of the Tax Court.

## I. Background

At a high level of generality, the facts of this case are simple: RERI acquired and donated a future interest in a piece of commercial property to the University of Michigan. RERI maintains the donation is a bona fide deduction that it valued reasonably at $33 million. The IRS says RERI artificially inflated the value of the donated property in order to offset the tax liability of its owners.

The corporate arrangements and transactions involved in this case are fairly complicated. For the sake of clarity, we lay them out in some detail.

## A. Facts

On February 7, 2002, RS Hawthorne, LLC — a shell company, whose only member was RS Hawthorne Holdings, LLC (RSHH), the only member of which was Red Sea Tech I, Inc. — purchased a 288,000 square-foot web-hosting facility located in Hawthorne, California for $42,350,000. At the time of the purchase, the Hawthorne Property was leased to AT&T. The lease had an initial term of 15.5 years, ending in May 2016; AT&T then had the option to renew it three times for periods

of five years each. The rent for each year during the initial term was spelled out in the lease; if AT&T renewed the lease, then the rent would be re-set at the then-market rate but not less than $14 per square foot per year.

RS Hawthorne financed its purchase with a mortgage loan from BB&T Bank. In connection with the loan, BB&T had the Hawthorne Property appraised by Bonz/REA, Inc. The appraisal "concluded that the Hawthorne property was worth $47 million as of August 16, 2001." *RERI Holdings I, LLC v. Comm'r*, 149 T.C. 1, 4 (2017).



Also on February 7, 2002, Red Sea divided its member interest in RSHH into two temporal interests: (1) a Term of Years (TOYS) interest lasting until December 31, 2020 and (2) the remainder, which the Tax Court refers to as the "successor member interest" (SMI). The SMI in RSHH is the donated property at issue in this case. Red Sea assigned the TOYS interest to PVP-RSG Partnership and sold the SMI to a company called RJS Realty Corporation for $1,610,000. The

agreement assigning the SMI to RJS imposes several conditions on Red Sea's TOYS interest, which the Tax Court assumed would also bind subsequent assignees. *Id.* at 6 n.4. First, the TOYS holder is prohibited from "causing or permitting any transfer of the Hawthorne property or the member interest in [RS] Hawthorne or the imposition of any lien or encumbrance on either" and is obligated to "take all reasonable actions necessary" to prevent waste of the Hawthorne property. *Id.* at 5. Of particular relevance to this appeal, the assignment also contained a non-recourse provision:

> In the event of any Breach of the provisions of this Assignment on the part of Assignor or any of its successors in interest hereunder, the recourse of Assignee or any of its successors in interest hereunder shall be strictly limited to the [TOYS interest]. In no event may any relief be granted that imposes on the owner from time to time of the [TOYS interest] any personal liability, it being understood that any and all remedies for any breach of the provisions hereof shall be limited to such owner's right, title and interest in and to the [TOYS interest].

In March 2002 RERI purchased the SMI from RJS for $2,950,000. RERI was a limited liability company that was formed on March 4, 2002 and dissolved on May 11, 2004. *RERI Holdings I, LLC v. Comm'r*, 107 T.C.M. (CCH) 1488, 1489 (2014).

In August 2003 Stephen M. Ross, one of RERI's members, pledged a gift of $4 million to the University of Michigan; he later increased the pledge to $5 million. In partial fulfillment of Ross's pledge, RERI assigned the SMI to the University pursuant to a Gift Agreement dated August 27, 2003. The Gift

Agreement provided, among other things, that the University "shall hold the Remainder Estate for a minimum of two years, after which the University shall sell the Remainder Estate in a manner and to a buyer of its choosing."

In December 2005 the University sold the SMI to HRK Real Estate Holdings, LLC for $1,940,000 although it had had the property appraised at $6.5 million earlier that year. The parties have stipulated that the sale price did not represent the fair market value of the SMI. The buyer, HRK, was indirectly owned in part by Harold Levine, one of RERI's members. The proceeds of the sale were credited toward Ross's pledge.

## B. Procedural History

Because RERI is treated as a partnership for federal income tax purposes, it filed a 2003 federal income tax return for informational purposes only; the actual taxpayers are the owners of shares in the LLC. RERI claimed a charitable contribution deduction of $33,019,000 for the transfer of a noncash asset, $32,935,000 of which represented the purported value of the donated SMI. (The remaining $84,000 was for appraisal and professional fees.) The valuation of approximately $33 million derives from an appraisal conducted by Howard Gelbtuch of Greenwich Realty Advisors, dated September 2003. As required by Treasury regulations, RERI attached the Gelbtuch appraisal to its return. RERI also completed a Form 8283 for Noncash Charitable Contributions; however, RERI left blank the space for "Donor's cost or adjusted basis." It did not provide any explanation for the omission.

The IRS thereafter selected RERI for audit and in March 2008 issued a Notice of Final Partnership Administrative Adjustment (FPAA). It disallowed $29 million of RERI's

deduction, based upon its determination that the SMI was worth only $3.9 million. Accordingly, it also imposed a penalty equal to 20% of the tax underpayment for a substantial valuation misstatement, pursuant to IRC § 6662(e)(1).[1]

In April 2008 RERI filed a petition in the Tax Court challenging the FPAA. In its answer, the IRS revised its determinations, asserting RERI was entitled to no deduction for a charitable contribution on the ground that the transaction giving rise to the deduction was "a sham for tax purposes or lacks economic substance." It argued in the alternative that the deduction should be limited to $1,940,000, the amount the University had realized from the sale of the SMI. Finally, the IRS claimed the valuation misstatement was "gross" rather than merely "substantial," triggering a penalty equal to 40% of the tax underpayment. *See* IRC § 6662(h)(1).

After a four-day trial, the Tax Court issued a judgment sustaining both the IRS's determination that RERI was not entitled to any charitable contribution deduction and its assessment of the 40% penalty. The Tax Court, however, did not base its decision upon the "lack of economic substance" theory advanced by the IRS; instead, it concluded that RERI had failed to substantiate the value of the donated property as required by Treasury regulations.[2]       149 T.C. at 17.

_____

[1] All references to the Internal Revenue Code and Treasury regulations contained herein refer to the 2003 version in effect during the tax year at issue.

[2] The IRS acknowledges that it did not raise the substantiation issue at any point during the proceedings before the Tax Court, and that RERI consequently did not have notice of the issue or an opportunity to argue that it substantially complied with the regulations. Yet, RERI does not argue to this court that it was denied procedural due process as a result, nor did it file a motion for reconsideration before

Nonetheless, on its way to affirming the penalty for a gross valuation misstatement, the Tax Court found the SMI was worth $3,462,886 on the date of the donation. The court also held RERI did not qualify for the "reasonable cause" exception to accuracy-related penalties. *See* IRC § 6664(c).

## II. The Charitable Contribution Deduction

RERI first challenges the Tax Court's ruling that it was not entitled to a charitable contribution deduction.

## A. Statutory Framework

Section 170 of the Internal Revenue Code permits a taxpayer to claim a deduction for a contribution to a charitable organization. This deduction can be abused by a taxpayer who inflates the valuation of the donated property. For that reason, IRC § 170(a)(1) provides that "[a] charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary."

In the Deficit Reduction Act of 1984 (DRA), the Congress directed the Secretary of the Treasury to increase the stringency of its requirements for verification. Pub. L. No. 983-69, § 155(a)(1), 98 Stat. 494, 691. Specifically, the DRA instructs the Secretary to promulgate regulations that require a taxpayer claiming a deduction for a noncash charitable contribution

> A. to obtain a qualified appraisal for the property contributed,

---

the Tax Court. *See* Tax Court Rule 161. We therefore consider any such argument forfeit. *See, e.g.*, *United States v. TDC Mgmt. Corp., Inc.*, 827 F.3d 1127, 1130 (D.C. Cir. 2016).

B. to attach an appraisal summary to the return on which such deduction is first claimed for such contribution, and

C. to include on such return such additional information (including the cost basis and acquisition date of the contributed property) as the Secretary may prescribe in such regulations.

In fulfillment of this mandate, the Secretary promulgated 26 C.F.R. § 1.170A-13, subsection (c) of which is most relevant to this case. Paragraph (c)(2) instantiates the three statutory requirements: The donor must (A) "[o]btain a qualified appraisal"; (B) "[a]ttach a fully completed appraisal summary ... to the tax return"; and (C) "[m]aintain records" containing specified information. Paragraph (c)(3) defines a "qualified appraisal" and paragraph (c)(4) details the necessary elements of an "appraisal summary," one of which is "[t]he cost or other basis of the property." § 1.170A-13(c)(4)(ii)(E). The taxpayer must provide the appraisal summary on IRS Form 8283. § 1.170A-13(c)(4)(i)(A).

A deduction is typically disallowed if these requirements are not met. There is an exception, however, "[i]f a taxpayer has reasonable cause for being unable to provide the information ... relating to the manner of acquisition and basis of the contributed property" in the appraisal summary. § 1.170A-13(c)(4)(iv)(C)(1). In that case, the deduction will still be allowed if the donor attaches "an appropriate explanation" to the appraisal summary. *Id.*

## B. Application

The Tax Court disallowed RERI's charitable donation deduction on the ground that it failed to comply with the substantiation requirements. First, the Tax Court held "the

reporting requirements of section 1.170A-13, Income Tax Regs., are directory and not mandatory," such that a taxpayer who "substantially complies" with the requirements is entitled to the claimed deduction. 149 T.C. at 15 (citing *Bond v. Comm'r*, 100 T.C. 32, 40-41 (1993)) (cleaned up). The court went on to conclude that RERI failed substantially to comply because it did not disclose its basis in the donated property.

The IRS urges this court to affirm the Tax Court on the alternative theory that substantial compliance with the regulation does not suffice, so that RERI's failure to include the basis on Form 8283 was automatically fatal. RERI, for its part, does not dispute that it failed to supply its basis in the SMI and to provide an explanation for the omission. Instead, RERI maintains that the substantial compliance doctrine does apply here, and that providing its basis in the donated property is not necessary for compliance. It emphasizes that both the Second Circuit and the Tax Court have concluded the substantiation requirements can be satisfied by substantial compliance. *See Scheidelman v. Comm'r*, 682 F.3d 189, 199 (2d Cir. 2012); *Bond*, 100 T.C. at 40-41.

In general, the Tax Court's determination as to whether an appraisal summary and appraisal satisfy the requirements of the Treasury Regulation is a mixed question of law and fact, which we review only for clear error. *Comm'r v. Simmons*, 646 F.3d 6, 9 (D.C. Cir. 2011). We have not, however, previously decided whether substantial compliance rather than literal compliance suffices under § 1.170A-13 (or, for that matter, under any other federal tax regulation). *See id.* at 12 n\*. Whether a taxpayer may satisfy the substantiation requirements through substantial compliance is a purely legal question, which we decide de novo. *Byers v. Comm'r*, 740 F.3d 668, 675 (D.C. Cir. 2014).

The Tax Court formulated the test for substantial compliance as "whether the donor provided sufficient information to permit the Commissioner to evaluate the reported contributions, as intended by Congress." 149 T.C. at 16 (quoting *Smith v. Comm'r*, 94 T.C.M. (CCH) 574, 586 (2007), *aff'd*, 364 F. App'x 317 (9th Cir. 2009)). The IRS advocates a significantly more stringent test under which anything short of complete compliance is excused only if "(1) [the taxpayer] had a good excuse for failing to comply with the regulation *and* (2) the regulation's requirement is unimportant, unclear, or confusingly stated in the regulations or statute." The Fourth, Fifth, and Seventh Circuits have adopted this formulation of the substantial compliance standard, albeit for different provisions of the tax code. *See Volvo Trucks of N. Am., Inc. v. United States*, 367 F.3d 204, 210 (4th Cir. 2004); *McAlpine v. Comm'r*, 968 F.2d 459, 462 (5th Cir. 1992); *Prussner v. United States*, 896 F.2d 218, 224 (7th Cir. 1990).

We conclude that, even if a taxpayer can fulfill the requirements of § 1.170A-13 through substantial compliance, RERI failed substantially to comply because it did not disclose its basis in the donated property; accordingly, we assume but do not decide that substantial compliance suffices. As we read the Tax Court's decision, a taxpayer must supply its basis (or an explanation for failing to do so) in order to "provide[] sufficient information to permit the Commissioner to evaluate the reported contributions, as intended by Congress." 149 T.C. at 16. If that is correct, and we think it is despite RERI's several arguments to the contrary, then we need not choose between the Tax Court's standard for substantial compliance and the IRS's more exacting one.

RERI first argues that the taxpayer's basis in a donated property is not necessary to evaluate the taxpayer's charitable contribution because the deductible amount is the fair market

value (FMV) of the property, and the basis is not an input in calculating the fair market value. But RERI fails to recognize that the purpose of the substantiation requirements is not merely to collect the information necessary to compute the value of donated property. The requirements have the broader purposes of assisting the IRS in detecting and deterring inflated valuations. Because the cost or other basis in property typically corresponds with its FMV at the time the taxpayer acquired it, an unusually large difference between the claimed deduction and the basis alerts the IRS to a potential over-valuation, particularly if the acquisition date, which must also be reported, is not much earlier than the date of the donation. In addition, as the Tax Court recognized, there are circumstances under which the basis affects the amount of the deduction allowed. 149 T.C. at 17 n.11 (citing § 170(e)(1)(A), under which the amount of a deduction must be reduced by "the amount of gain which would not have been long-term capital gain," had the property "been sold … at its fair market value"). It is therefore unsurprising that the DRA expressly lists "the cost basis ... of the contributed property" as information to be provided in substantiation of a charitable deduction. Though the Congress left it to the discretion of the Secretary of the Treasury to impose additional reporting requirements, the Congress specifically identified the basis and the date of acquisition as the bare minimum that a taxpayer must provide. We should be very reluctant to set to naught what the Congress deemed essential.

Moreover, in this case, the Tax Court found there was in fact a "significant disparity between the claimed fair market value [of $33 million] and the [$3 million] RERI paid to acquire the SMI just 17 months before it assigned the SMI to the University." 149 T.C. at 17. Hence, the Tax Court did not, as RERI claims, merely "hypothesize" that providing its basis would have alerted the IRS to a potential over-valuation.

RERI contends in the alternative that the omission of a number in a tax filing is typically construed as a zero, and that a zero provides the same red flag as does an unusually low basis. The point would have some force had the Secretary not provided for the donor to substitute an explanatory statement if it is "unable" to provide information on the cost basis. § 1.170A-13(c)(4)(iv)(C)(1). Because a taxpayer may lack information about its basis, the IRS reasonably chose not automatically to treat a blank box as a zero. RERI did not lack information about its basis or have any other excuse for its failure to report its basis.

Finally, RERI argues the Tax Court's ruling "conflicts with ... its prior holding in *Dunlap v. Commissioner*, 103 T.C.M. (CCH) 1689 (2012)." That the Tax Court came to a conclusion in this case different from that in *Dunlap* does not mean it clearly erred. In *Dunlap*, the court excused the petitioners' failure to supply their basis on Form 8283 on the ground that supplying the basis was not "necessary to substantially comply with the Instructions." *Id.* at 1706.

A memorandum opinion, such as the one in *Dunlap,* does not bind the Tax Court. *See, e.g.*, *Dunaway v. Comm'r*, 124 T.C. 80, 87 (2005). In any event, *Dunlap* is quite different from the present case. There the Tax Court discussed the completeness of Forms 8283 only in deciding whether the taxpayers had "made a good-faith attempt to report their contributions" so as to qualify for the reasonable cause and good faith exception to accuracy-related penalties. *Dunlap*, 103 T.C.M. at 1707; *see also Belair Woods, LLC v. Comm'r*, T.C. Memo 2018-159, slip op. at 21 n.8 (Sept. 20, 2018). The court did not consider whether the taxpayers satisfied the substantiation requirements. Nor did the *Dunlap* court find there was in fact a significant disparity between the basis and

the claimed deduction; there indisputably is such a disparity in this case.

In short, we agree with the Tax Court that RERI fell short of the substantiation requirements by omitting its basis in the donated property. Therefore, we do not reach the IRS's further argument that RERI failed to satisfy the substantiation requirements because the appraisal it submitted was not a "qualified appraisal" within the meaning of § 1.170A-13(c)(3).

### III. The Valuation Misstatement Penalty

Having affirmed the Tax Court's denial of the charitable contribution deduction, we proceed to consider whether the Tax Court properly approved a penalty for misstating the value of the donated property. IRC § 6662 instructs the IRS to levy an "accuracy-related penalty" if "any portion of an underpayment of tax" in excess of $5,000 is "attributable to ... [a]ny substantial valuation misstatement." IRC §§ 6662(a), (b)(3), and (e)(2). If the taxpayer claims the value of the property for which it seeks a charitable deduction is 200% or more of the true value of the property, then the misstatement is "substantial," § 6662(e)(1)(A), and the penalty is 20% of the resulting underpayment of tax. § 6662(a). If the taxpayer's claimed value is 400% or more of the true value, then the misstatement is "gross," § 6662(h)(2)(A), and the penalty is 40% of the resulting underpayment. §§ 6662(a), (h)(1).

IRC § 6664(c), however, provides a defense to the accuracy-related penalty: "No penalty shall be imposed ... with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion."

The Tax Court found RERI liable for the 40% penalty reserved for a gross valuation misstatement because its stated value of the donated property ($33 million) is more than 400% of the true value of the property ($3,462,886), as determined by the court.  149 T.C. at 37.  RERI raises four objections to this ruling, each of which would be an independent ground for reversal.  We reject all of them and affirm the judgment of the Tax Court.[3]

## A.  Supervisory Approval Requirement

RERI first contends the IRS failed to meet a procedural requirement in IRC § 6751(b)(1), which provides:

> No penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate.

The IRS concededly did not present evidence establishing that it had met this requirement.  At the time of the proceedings below, the IRS took the position that the statute does not require approval until assessment, which does not occur until a decision of the Tax Court becomes final.  *See also Graev v. Comm'r*, 147 T.C. 460, 478 (2016) (*Graev I*) (adopting the IRS's position).

---

[3] The parties dispute whether the IRS bore the burden of production in the Tax Court pursuant to § 7491(c) with regard to RERI's liability for the penalty.  We need not decide the issue, however, because the IRS clearly met that burden with respect to the three challenges that were not forfeited.

RERI, however, failed to raise its objection before the Tax Court, which would ordinarily mean it is forfeit. *See, e.g.*, *Petaluma FX Partners, LLC v. Comm'r*, 792 F.3d 72, 78 (D.C. Cir. 2015). RERI attempts to avoid this result on the ground that a recent Second Circuit decision, *Chai v. Commissioner*, 851 F.3d 190 (2017), represents an "intervening change in law." In *Chai* the court held written approval must be obtained "no later than the date the IRS issues the notice of deficiency (or files an answer or amended answer) asserting such penalty." *Id.* at 221; *see also Graev v. Comm'r*, 149 T.C. 485, 493 (2017) (*Graev II*) (vacating *Graev I* in light of *Chai*).

RERI asks us to excuse its failure to raise this argument before the Tax Court on the ground that prior to *Chai* it did not clearly have a claim the IRS violated § 6751(b)(1). Fiddlesticks. The fact is that when RERI was before the Tax Court, it "was free to raise the same, straightforward statutory interpretation argument the taxpayer in *Chai* made" there. *Mellow Partners v. Comm'r*, 890 F.3d 1070, 1082 (D.C. Cir. 2018); *accord Kaufman v. Comm'r*, 784 F.3d 56, 71 (1st Cir. 2015). We therefore see no reason to excuse RERI's failure to preserve its claim.

## B. "Attributable to" Requirement

Recall that an accuracy-related penalty applies only to the "portion of the underpayment ... attributable to one or more gross valuation misstatements." § 6662(h)(1). RERI's second argument is that, even if it misstated the value of the donated property, its underpayment is not "attributable to" that misstatement within the meaning of the penalty statute because the Tax Court's stated reason for disallowing the deduction — which resulted in the underpayment — was RERI's failure properly to substantiate the donation per IRC § 170 and the associated regulations. This ground for the adjustment does

not relate to a misstatement of the value of the contributed property. Subsequently, however, the Tax Court also determined the taxpayer misstated the value of the donated property. In these circumstances, is the underpayment fairly "attributable to" the valuation misstatement? Put another way, can an underpayment be attributable to two independent grounds for an adjustment?

Consistent with its own precedent, the Tax Court answered this question in the affirmative. 149 T.C. at 21 (citing *AHG Invs., LLC v. Comm'r*, 140 T.C. 73 (2013)). Because the proper interpretation of the phrase "attributable to" is a legal issue, we resolve the question de novo. *See Byers*, 740 F.3d at 675. For the reasons that follow, we agree with the Tax Court that an underpayment can be "attributable to" more than one cause if one of the causes is a misstatement of value.

To begin, nowhere does the statute suggest there can be only a single cause for an underpayment. The phrase "attributable to" comfortably comprehends situations in which the IRS has multiple reasons for adjusting a charitable deduction. Moreover, as the First Circuit has recognized, RERI's reading of § 6662 has the perverse result of "allow[ing] the taxpayer to avoid a penalty otherwise applicable to his conduct on the ground that the taxpayer had also engaged in additional violations that would support disallowance of the claimed losses." *Fidelity Int'l Currency Advisor A Fund, LLC v. United States*, 661 F.3d 667, 673 (2011). A penalty is meant to deter and punish abuse of the tax laws; those purposes would be frustrated if it were interpreted in such a way as to reward a taxpayer for committing multiple abuses. *See id*.

RERI nonetheless advances an argument based principally upon the Supreme Court's decision in *United States v. Woods*, 571 U.S. 31 (2013), which postdates the precedent upon which

the Tax Court relied.  In *Woods* the district court had concluded the taxpayers' partnerships lacked economic substance; it therefore disallowed deductions for losses generated by those partnerships.  *Id.* at 37.  The taxpayer argued that a penalty under § 6662 for misstatement of its basis did not apply because the underpayment was "attributable to" the lack of economic substance as opposed to the misstatement of its basis.  *Id.* at 46-47.  The Court rejected the argument because "the economic-substance determination and the basis misstatement are not 'independent' of one another."  *Id.* at 47.  On the contrary, they were "inextricably intertwined": "The partners underpaid their taxes because they overstated their outside basis, and they overstated their outside basis because the partnerships were shams."  *Id.* (cleaned up).

RERI reads this decision to imply that, had the two grounds for disallowance been independent rather than "inextricably intertwined," the Court would not have upheld the penalty.  That implication is unfounded: Having "reject[ed] the argument's premise," the Court did not reach Woods's claim that the underpayment was attributable only to one of the two "independent legal ground[s]."  *Id.*

As RERI points out, however, the Fifth and Ninth Circuits have adopted its position.  *See Todd v. Comm'r*, 862 F.2d 540, 542 (5th Cir. 1988); *Gainer v. Comm'r*, 893 F.2d 225, 228 (9th Cir. 1990).  Like the First Circuit in *Fidelity* and the Federal Circuit in *Alpha I, L.P. ex rel. Sands v. United States*, 682 F.3d 1009 (2012), we regard the reasoning in those cases as flawed.  Both cases relied upon the *General Explanation of the Economic Recovery Tax Act of 1981*, also known as the "Blue Book."  *Todd*, 862 F.2d at 542-43; *Gainer*, 893 F.2d at 227-28.  Prepared by the staff of the Joint Committee on Taxation*,* the Blue Book explains how to calculate a valuation misstatement penalty: "The portion of a tax underpayment that is attributable

to a valuation overstatement will be determined after taking into account any other proper adjustments to tax liability." Staff of the J. Comm. on Taxation, 97th Cong., General Explanation of the Economic Recovery Tax Act of 1981, at 333 (Comm. Print 1981). In particular, *Todd* and *Gainer* focused upon the following example:

> Assume ... an individual files a joint return showing taxable income of $40,000 and tax liability of $9,195. Assume, further, that a $30,000 deduction which was claimed by the taxpayer as the result of a valuation overstatement is adjusted down to $10,000, and that another deduction of $20,000 is disallowed totally for reasons apart from the valuation overstatement. These adjustments result in correct taxable income of $80,000 and correct tax liability of $27,505. Accordingly, the underpayment due to the valuation overstatement is the difference between the tax on $80,000 ($27,505) and the tax on $60,000 ($17,505) ... or $9,800.

*Id.* at 333 n.2, quoted in *Todd*, 862 F.2d at 543, and in *Gainer*, 893 F.2d at 228 n.4. From this example, both courts concluded that, when there is another reason for disallowing a deduction, the taxpayer's overvaluation "becomes irrelevant to the determination of any tax due." *Gainer*, 893 F.2d at 228. The Federal Circuit has aptly explained the flaw in that reasoning:

> The Blue Book ... offers the unremarkable proposition that, when the IRS disallows two different deductions, but only one disallowance is based on a valuation misstatement, the valuation misstatement penalty should apply only to the deduction taken on the valuation misstatement, not the other deduction, which is unrelated to valuation misstatement. The

> court in *Todd* mistakenly applied that simple rule to a situation in which the *same* deduction is disallowed based on both valuation misstatement- and non-valuation-misstatement theories.

*Alpha I, L.P.*, 682 F.3d at 1029.

We note also that more recent Fifth and Ninth Circuit decisions retreat from *Todd* and *Gainer*. In *PBBM-Rose Hill, Ltd. v. Commissioner,* for instance, the Tax Court had denied PBBM's charitable contribution deduction for failing to meet the statutory requirements for "a qualified conservation easement." 900 F.3d 193, 209 (5th Cir. 2018). The Fifth Circuit nonetheless affirmed the Tax Court's imposition of a penalty for a gross valuation misstatement for having also misstated the value of the easement. *Id.* at 215; *see also Keller v. Comm'r*, 556 F.3d 1056, 1060-61 (9th Cir. 2009) (recognizing the approach we take here as "sensible," but explaining that its decision is "constrained by *Gainer*").

In sum, because the Tax Court determined that RERI made a gross valuation misstatement and that misstatement was an independent alternative ground for adjusting RERI's deduction, the penalty properly applies.

## C. Whether RERI Misstated the Value of the Donated Property

Next, RERI contests the Tax Court's factual finding that it grossly misstated the value of the donated property. The Tax Court determined that the correct value of the SMI was $3,462,886; the $33 million RERI reported was well over 400% of that figure. 149 T.C. at 37. RERI maintains the Tax Court undervalued the SMI as a result of two independent errors. First, RERI claims the Tax Court was required to

determine the value of the SMI using actuarial tables, pursuant to IRC § 7520. Second, RERI argues that, even if the Tax Court did not err in setting aside the actuarial tables, it applied too-high a discount rate in calculating the fair market value of the donated property.

### 1. Applicability of the actuarial tables

In general, a deduction for a charitable contribution is equal to "the fair market value [FMV] of the property at the time of the contribution." 26 C.F.R. § 1.170A-1(c)(1). Treasury regulations define FMV as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." § 1.170A-1(c)(2).

As the Tax Court recognized, however, "the willing buyer-willing seller standard is not applied directly" to a remainder interest, 149 T.C. at 25, the value of which depends upon various economic and demographic facts, such as the applicable depreciation rate or the life expectancy of the holder of a life estate. Because making and — for the IRS — evaluating case-specific estimates would be inefficient, IRC § 7520(a) instructs that "the value of any annuity, any interest for life or a term of years, or any remainder or reversionary interest shall be determined ... under tables prescribed by the Secretary." Published periodically by the IRS, these tables contain actuarial factors that "divide the fair market value of the underlying property among the several interests in the property." 149 T.C. at 25. The factors incorporate uniform assumptions in order to make valuations more convenient and consistent. As a result, they inevitably produce estimates that differ somewhat from a more particularized calculation of the FMV of any specific partial interest.

Some situations, however, may be so inconsistent with the assumptions underlying the tables that actuarial valuation will not produce a reasonably accurate estimate. For that reason, the implementing regulations contain various exceptions. *See* 26 C.F.R. § 1.7520-3. As relevant here, § 1.7520-3(b)(2)(iii) prohibits the use of the tables to calculate the value of a remainder or reversionary interest unless the relevant legal instruments "assure that the property will be adequately preserved and protected (e.g., from erosion, invasion, depletion, or damage) until the remainder or reversionary interest takes effect in possession and enjoyment." Without that protection, there is a risk that waste or other damage will impair the value of the future interest, which risk is not reflected in the actuarial tables. Hence, the exception provides the appropriate valuation is "the actual [FMV] of the interest (determined without regard to section 7520) ... based on all of the facts and circumstances." § 1.7520-3(b)(1)(iii).

In this case, the Tax Court ruled that the § 7520 tables were inapplicable because "the SMI does not meet the adequate protection requirement" quoted above. 149 T.C. at 27. The court went on to make an independent valuation of the SMI of $3.4 million based upon evidence introduced at trial. *Id.* at 37.

As an initial matter, RERI contends the applicability of the tables is a legal determination to be reviewed de novo. *See Anthony v. United States*, 520 F.3d 374, 377 (5th Cir. 2008) (applying de novo review to the question whether the taxpayer's annuities were restricted beneficial interests). We disagree. Whether the agreements governing the SMI "adequately preserved and protected" it within the meaning of § 1.7520-3(b)(2)(iii) is a mixed question of law and fact. We

therefore review the Tax Court's decision for clear error and, as explained below, see none.[4]

The Treasury regulations indicate protection is adequate if it is "consistent with the preservation and protection that the law of trusts would provide for a person who is unqualifiedly designated as the remainder beneficiary of a trust for a similar duration." § 1.7520-3(b)(2)(iii). In this case, the assignment agreement contained a non-recourse provision under which the liability of the TOYS holder is "strictly limited to" early forfeiture of the property. Consequently, in the event of waste or other harm to the property, the only recourse of the SMI holder (the University) is to take possession of the damaged property; the SMI holder does not have the right to sue the TOYS holder for damages. By contrast, a trustee that failed to preserve and maintain a trust asset would be liable to the remainderman for damages. *See, e.g.*, *United States v. Mitchell*, 463 U.S. 206, 226 (1983). Indeed, as the Tax Court recognized, "the holder of a remainder interest in property, even outside of a trust, would be protected against waste and other actions that would impair the value of the property." 149 T.C. at 28**.** The Tax Court therefore concluded "the inability of the SMI holder to recover damages for waste or other acts that prejudice its interests exposes the SMI holder to a sufficient risk of impairment in value that the SMI holder does not enjoy a level of protection consistent with that provided by the law of trusts." *Id.* at 26-27.

RERI does not dispute the Tax Court's interpretation of the assignment agreement or its understanding of the law of

---

[4] As a result, we need not pass upon the IRS's alternative theory that the SMI is a "restricted beneficial interest" to which the actuarial factors do not apply. *See* § 1.7520-3(b)(1)(ii).

trusts. Instead, RERI claims the exceptions to § 7520 are to be construed narrowly and applied in only limited circumstances. RERI accuses the Tax Court of ignoring the protections the assignment agreement does contain, in effect requiring the property to be "perfectly preserved and protected" rather than "adequately preserved and protected." At the outset, we do not agree the exceptions are to be applied, as RERI claims, "only when the circumstances indicate there is little likelihood that the interest being valued will have any meaningful worth." To the contrary, the regulation expressly states protection is adequate

> only if it was the transferor's intent, as manifested by the provisions of the arrangement and the surrounding circumstances, that the entire disposition provide the remainder or reversionary beneficiary with an undiminished interest in the property transferred at the time of the termination of the prior interest.

§ 1.7520-3(b)(2)(iii). Moreover, the Tax Court did not require that the SMI be preserved as if it were held in trust. For one, the court did not specify that the SMI holder must be made whole in the event of waste or other material breach, *see* Restatement (Third) of Trusts § 100 (Am. Law Inst. 2012); it simply held there must be some remedy beyond early forfeiture. Although there is no doubt some daylight between the law of trusts and what is required to satisfy § 1.7520-3(b)(2)(iii), we cannot say the Tax Court clearly erred in concluding the level of protection here is "inadequate." We therefore affirm its decision not to apply the actuarial tables.

## 2. Actual fair market value

Because it found the actuarial tables were inapplicable, the Tax Court calculated "the actual [FMV]" of the SMI as of

August 2003, the date of the gift, using the "discounted cash flow method." *See* 149 T.C. at 29. The premise of this method is that the value of an asset is equal to the future income it is expected to produce, discounted to the valuation date. The discount rate used should account for both the time value of money and the risk of the future income stream not materializing. Thus, a higher discount rate implies the future cash flow is more uncertain.

Applying this method, the Tax Court first projected the cash flow for the SMI in perpetuity starting from January 1, 2021, when the SMI becomes possessory. *Id*. The court then discounted that amount to August 2003, using a discount rate of 17.75% rather than RERI's proffered rate of 11.01%. 149 T.C. at 30, 32, 36. RERI now challenges the Tax Court's calculation of the actual FMV of the SMI solely on the ground that the court used "a wildly inflated discount rate," leading it to understate the value of the property.

We review the Tax Court's selection of the appropriate discount rate for clear error. *See Energy Capital Corp. v. United States,* 302 F.3d 1314, 1332 (Fed. Cir. 2002) ("The appropriate discount rate is a question of fact"). In so doing, we are mindful that valuation is not an exact science; it requires making the most of the available data. We therefore defer to the Tax Court's choice of discount rate so long as it "is plausible in light of the record viewed in its entirety." *Anderson*, 470 U.S. at 574 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous").

To determine the discount rate, the Tax Court relied upon the analysis of Dr. Michael Cragg, one of the IRS's experts; details of his analysis are laid out in the Appendix. Of relevance here, Dr. Cragg's method was based upon the

premise that the $42.35 million RS Hawthorne paid for the Hawthorne Property represented the fee value of that property in February 2002, which in turn was equal to the discounted value of future cash flow in perpetuity. By calculating cash flow from 2002 onward, Dr. Cragg solved for the discount rate implied by that fee value. This produced a discount rate of 18.99%, which implies "a risk premium of 13.39% over the February 2002 long-term applicable Federal rate (AFR) of 5.6%." 149 T.C. at 30 (citing Rev. Rul. 2002-5, 2002-1 C.B. 461). The AFR, which is published monthly by the IRS, approximates the interest rate on Treasury securities, IRC § 1274(d); it represents the risk-free time value of money. Because Dr. Cragg's analysis was "directed at a [valuation] date other than August 27, 2003," the court adjusted his rate "to reflect changes in the AFR between February 2002 and August 2003." 149 T.C. at 35-36. That is, it added Dr. Cragg's risk premium of 13.39% to the August 2003 AFR of 4.36%, which produced a discount rate of 17.75%. *Id.* at 36.

RERI challenges that discount rate on the grounds that the Tax Court erroneously (1) adopted Dr. Cragg's "novel and untested" method for deriving the risk premium; (2) accepted Dr. Cragg's flawed factual assumptions in applying this method; and (3) made an insufficient adjustment to correct for Dr. Cragg's use of the wrong valuation date.

As to its first point, we see nothing at all problematic about rearranging the commonly recognized discounting formula to solve for the discount rate. RERI's primary complaint appears to be that the Tax Court should have adopted the "commonly recognized method" used by RERI's expert, Mr. James Myers. He applied a discount rate of 11%, based upon "investor return rates for comparable commercial properties," increased for the greater uncertainty of a longer-term projection. The Tax Court explained why it found Dr. Cragg's method "more credible"

than that of Mr. Myers: "Dr. Cragg's analysis gives more account to the difference in risk between the expected cashflows during and after the initial period of the AT&T lease." 149 T.C. at 32. The Tax Court's desire to account for the change in risk after the initial period of the AT&T lease — for which the rents are not yet determined — is perfectly reasonable.

RERI further objects that Dr. Cragg did not check his results against "market data" to confirm "his conclusion that at the relevant period investors would have applied a discount rate of 18.99%." For instance, RERI would have had Dr. Cragg incorporate evidence it introduced through its expert "regarding the data center industry, the market conditions in the area around the Property, the condition of the Property, zoning, and market rent for powered shell data centers, including lease comparables." Dr. Cragg did not need to rely upon this evidence because he was using actual data specific to the Hawthorne Property, to wit, the sale price of the fee interest and the terms of AT&T's lease. To be sure, comparing his results against market data might have bolstered the analysis, but failing to do so does not amount to clear error.

RERI next challenges two of the inputs Dr. Cragg used to calculate the discount rate. The first is another discount rate. Part of Dr. Cragg's method involved calculating the value of the cash flow through May 2016 — the end of the initial term on the AT&T lease — in February 2002 dollars. In doing so, Dr. Cragg used a 7.92% discount rate. RERI argues that this rate — which approximates AT&T's corporate bond rate for a 14-year bond as of March 2002 — is inappropriate for valuing an illiquid asset such as the Hawthorne Property. According to RERI, the Tax Court should have added a 1.5 percentage point liquidity premium. The higher discount rate would give the cash flow during the initial lease term a lower present value,

which results in a higher present value for the post-2016 cash flow, which then supports a higher valuation for the donated future interest. As the IRS aptly explains, however, "the only relevant risk in determining the present value of projected cash flows during the initial lease term was AT&T's credit risk" — which is analogous to the risk of AT&T defaulting on its debt obligations, as reflected in its corporate bond rate. Accordingly, we see no clear error in the Tax Court's relying upon this analogy.

Another input the Tax Court needed was the fee value of the Hawthorne property as of August 2003. The court, like Dr. Cragg, used the $42.35 million that RS Hawthorne had paid for the property. RERI objects that the sale took place in February 2002, "18 months before the correct valuation date." RERI would have us use its expert's $52 million estimate of the fee value as of August 2003. To be sure, the Tax Court could reasonably have undertaken to adjust the $42.35 million figure for changes in market conditions during that period; RERI had introduced evidence relevant to the task. Instead, the Tax Court, again reasonably, adopted Dr. Cragg's estimate of the discount rate for February 2002 and then adjusted that rate to reflect the change in the AFR over the relevant time period.

Relatedly, RERI argues the Tax Court's adjustment did not suffice to correct Dr. Cragg's use of the wrong valuation date. The Tax Court accounted only for the change in the AFR, whereas RERI contends Dr. Cragg's risk premium was too high because there was also a change in market conditions between April 2002 and August 2003; that is, long-term rental values rose during the intervening months. As a result, says RERI, the expected post-May 2016 cash flow should have been higher than in Dr. Cragg's analysis, which would have produced a lower discount rate.

Because AT&T's lease specified the rent only through 2016, Dr. Cragg approximated post-2016 rents by assuming they would increase by 3.29% each year thereafter; he derived this growth rate from "an index of U.S. commercial real estate prices." 149 T.C. at 10. There are limits to the precision with which the Tax Court can reasonably be expected to estimate the inputs to its valuation. Accordingly, we reject RERI's suggestion that the Tax Court be required to incorporate every available piece of data that might have affected the expected future cash flow from the SMI. Indeed, RERI does not itself calculate how the Tax Court's valuation would have been different had it incorporated every datum that RERI proffered, except to say that future cash flow would have been "millions of dollars higher." Under these circumstances, we cannot say the Tax Court clearly erred.

## D. Reasonable Cause Exception

We come now to RERI's final argument, *viz*., that it qualifies for the exception to a value-misstatement penalty because "there was a reasonable cause" for the underpayment and "the taxpayer acted in good faith." IRC § 6664(c)(1). In charitable contribution cases, § 6664(c)(3) provides more specifically that the exception applies only if:

> A. the claimed value of the property was based on a qualified appraisal made by a qualified appraiser, and
> B. in addition to obtaining such appraisal, the taxpayer made a good faith investigation of the value of the contributed property.

### 1. Burden of proof

The taxpayer typically bears the burden of showing that it qualifies for the reasonable cause and good faith exception. *Barnes v. Comm'r*, 712 F.3d 581, 584 (D.C. Cir. 2013). That is, the taxpayer must prove that both elements of § 6664(c)(3) are satisfied.

According to RERI, however, this general rule is superseded here by Tax Court Rule 142(a)(1), which provides that "[t]he burden of proof" is upon the Commissioner "in respect of any new matter, increases in deficiency, and affirmative defenses, pleaded in the answer." In this case, the IRS originally applied only a substantial valuation misstatement penalty; not until it filed its second amendment to its answer to RERI's petition before the Tax Court did the IRS seek to impose a gross valuation misstatement penalty. The Tax Court has previously stated that an increase in the amount of a penalty or addition to tax asserted in an answer is a "new matter" on which the IRS bears the burden of proof. *See Rader v. Comm'r*, 143 T.C. 376, 389 (2014); *Arnold v. Comm'r*, 86 T.C.M. (CCH) 341, 344 (2003). The Tax Court has further held that when the IRS bears the burden of proof as to a penalty, it must negate any defense thereto, such as a taxpayer's reasonable cause and good faith. *See Cavallaro v. Comm'r*, 108 T.C.M. (CCH) 287, 299 (2014). Hence, RERI claims the change from a "substantial" to a "gross" penalty was a "new matter" as to which the IRS bears the burden of proving RERI lacked reasonable cause for its underpayment.

In this case, the Tax Court assumed RERI was correct and that the IRS therefore bore the burden of proving the absence of reasonable cause; the court then held the IRS had carried its burden. 149 T.C. at 40. Typically, we review the Tax Court's application of the reasonable cause and good faith exception

for clear error.  *See Green Gas Del. Statutory Tr. v. Comm'r*, 903 F.3d 138, 146 (D.C. Cir. 2018).  But the appropriate construction of the Tax Court's rule regarding the burden of proof is a purely legal question, which we decide de novo.

We agree with the Tax Court's decision not to excuse RERI's gross valuation misstatement under the reasonable cause and good faith exception, albeit for a slightly different reason: RERI bore the burden of proving it had met the requirements and failed to do so.  In prior cases involving an increase in penalty, the Tax Court's solution has been to apply a "divided" burden: "In defending against the penalty initially determined, the taxpayer bears the burden of proving reasonable cause, while the Commissioner, to justify the asserted increase in the penalty, must prove the absence of reasonable cause."  149 T.C. at 39 (citing *Rader*, 143 T.C. at 389; *Arnold*, 86 T.C.M. (CCH) at 344).

We express no opinion as to whether Rule 142 requires the IRS to negate affirmative defenses when it pleads a new penalty in an answer.  Even under the Tax Court's scheme dividing the burden, however, RERI would properly have to show (1) "the claimed value of the property was based on a qualified appraisal made by a qualified appraiser," and (2) it "made a good faith investigation of the value of the contributed property" under § 6664(c)(3) in order to qualify for the reasonable cause exception to the original "substantial" penalty.  "Placement of the burden of proof affects only the obligation to prove facts." *Shea v. Comm'r*, 112 T.C. 183, 197 n.22 (1999).  If a defense to a new matter "is completely dependent upon the same evidence," *id.*, as a defense to the penalty originally asserted, then there is no practical significance to shifting the burden of proof.  Furthermore, "the taxpayer would not suffer from lack of notice concerning what facts must be established." *Id.*  Here, the facts required to

establish the two elements of the reasonable cause and good faith exception are the same regardless whether the alleged misstatement was "substantial" or "gross." In other words, although the IRS may theoretically have had the burden of proof as to the increase in penalty, there was no additional fact to which that burden applied.

## 2. Good faith investigation

Having concluded that RERI must prove its entitlement to the reasonable cause and good faith exception, we can easily determine it has failed to show that it conducted a good faith investigation within the meaning of § 6664(c)(3)(B).

A "good faith investigation" calls for some action beyond "simply accept[ing] the result of a qualified appraisal for the requirement ... to have any meaning." 149 T.C. at 40. RERI asserts that it met this requirement by comparing the Gelbtuch appraisal of the Hawthorne Property at $55 million in August 2003 with (1) the Bonz/REA appraisal of $47 million in August 2001 and (2) the $42 million that RS Hawthorne paid to acquire the property in February 2002. The Tax Court rejected these two comparisons, stating that "marshaling evidence of a property's value 18 months or more before a gift is simply not sufficient as a matter of law to qualify as a good faith investigation." 149 T.C. at 41 (cleaned up). Due to the amount of time that had passed, the Tax Court explained, that evidence "is of limited worth in assessing the property's value in August 2003." *Id.*

On appeal, RERI challenges the Tax Court's reasoning. It points out that, in calculating the discount rate, the Tax Court adopted Dr. Cragg's use of the February 2002 sale price to approximate the fee value in August 2003. What is more,

RERI is correct that the Tax Court provided "no reason why the same evidence is reliable for one purpose, but not another."

We need not consider whether the Tax Court erred in this respect, however, because the court also found "[t]he record provides no evidence" on the factual question whether RERI "was aware of those data and took them into account in determining the amount to claim as a deduction." 149 T.C. at 41. In other words, RERI failed to produce evidence that it conducted any investigation beyond the appraisal, let alone one that qualifies as a "good faith investigation" within the meaning of the statute. Consequently, RERI has not carried its burden and we need not reach the IRS's additional argument that RERI did not satisfy the other element of the defense, the requirement of a qualified appraisal. We therefore affirm the Tax Court's conclusion that RERI was not entitled to the reasonable cause and good faith exception.

## IV. Conclusion

For the reasons set forth above, the judgment of the Tax Court is

*Affirmed.*

**Appendix: Dr. Cragg's method of determining the discount rate**

1. The fee value of the Hawthorne property = (the present value of cash flow through May 2016) + (the present value of cash flow in perpetuity after May 2016).

2. The fee value of the Hawthorne property is the $42.35 million that RS Hawthorne paid in February 2002.

3. The cash flow through May 2016, the end of the initial term of the AT&T lease, is the fixed rent to be paid by AT&T.

4. Discounting the AT&T rents through May 2016 at a rate of 7.92% yields a present value of $39.06 million.

5. Subtracting $39.06 million from $42.35 million produces a present value of $3.29 million for the post-May 2016 cash flow. This is the implied value, as of February 2002, of the remaining years of the TOYS interest (May 2016 to December 2020) together with the SMI (from 2021 onwards).

6. Project the post-May 2016 cash flow by assuming that rent will increase each year by 3.29 percent from the scheduled rent at the end of the AT&T lease.

7. Solve for the discount rate that would produce a present value, as of February 2002, of $3.29 million from the projected post-May 2016 cash flow. The answer is 18.99%.